**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SOCi, Inc., | Docket No.:_____ |
| *Plaintiff*, | **COMPLAINT** |
| *vs.* | |
| Yext, Inc., | |
| *Defendant*. | |

Plaintiff SOCi, Inc. ("SOCi" or "Plaintiff") by and through its undersigned attorneys, upon knowledge as to its own actions and otherwise upon information and belief, brings this action against Yext, Inc. ("Yext" or "Defendant"), and alleges as follows:

## NATURE OF THE ACTION

1.     This action arises out of Defendant's willful and intentional scheme to steal SOCi's confidential and trade secret business and product plans, customer information, technology, and other proprietary information, and gain an unfair business advantage over SOCi, by targeting and recruiting SOCi's skilled and knowledgeable employees to join Yext, and encouraging them to breach their non-compete and non-solicitation obligations and share SOCi's confidences.  In short, Yext is brazenly and illegally attempting to undermine a competitor.

2.     SOCi and Yext are technology companies; providing solutions for multi-location marketing.  While the solutions that SOCi and Yext offer do not completely overlap, they are in direct competition with one another on certain products and services that they sell to the same customer base, and that represent a significant portion of revenue for both companies.  With respect to these offerings, Yext and SOCi are the two largest players in the market.

3.     The impetus for this scheme appears to be Yext's internal challenges.  Yext's growth has stagnated.  For example, Yext reported only a one percent revenue increase year over year in the first quarter of 2024, and its stock price is down more than 60% in the last year.  Yext has executed multiple rounds of layoffs over the last two years (including letting go of 12 percent of its workforce as recently as June 5, 2024).  It was recently announced that Yext is acquiring Hearsay Systems, which focuses on financial services compliance, which represents another sign of how the company is attempting to manufacture growth.

4.     Among Yext's other issues, it has fallen significantly behind in advancing its offerings to provide additional technological solutions to its customers such as social media management, as well as in the race to integrate artificial intelligence ("AI") into its product offerings.  For example, no AI products were announced at Yext's annual customer conference, Yext Summit, held in February 2024, even though AI products take months, if not years, to develop and engineer, and these sorts of customer events are where companies, including Yext, traditionally disclose the roadmaps for top innovations.  In fact, at Yext's 2024 Summit, multiple speakers opined on Yext's behalf that AI was not ready to be a material part of platforms like theirs, and instead was only a tool to be used discretely by the human workers for time-intensive projects.

5.     In a misguided effort to catch up in areas where Yext had fallen behind, Yext has resorted to attempting to take what it could not create on its own.  Even while laying off scores of its own people, Yext has aggressively recruited dozens of SOCi employees, in many cases in knowing breach of the employees' non-compete obligations, by promising them outsized compensation, guaranteed payments and bonuses, and in some cases elevated titles to lure them to join Yext and to share SOCi's confidential information and trade secrets.  Through these efforts,

Yext successfully recruited, amongst others, Stuart Greer, who was the Senior Director of Sales for SOCi, and head of SOCi's Regulatory Sales division, Jenette Simisky, who was the Senior Director of Product Management-Social Media, and Chris Brownlee, who was the Senior Director of Product Management-Reputation Management.  Greer, Simisky, and Brownlee, the key players in this scheme, and the other former SOCi employees who have joined Yext, are each referred to herein individually as a "Former Employee" and collectively as the "Former Employees."

6.      Critically, Brownlee and Simisky – both equity option holders at SOCi – were the product leads for two of SOCi's innovative and first-to market "Genius" line of products that fully integrates AI into its services and enables full automation of certain tasks.  As heads of these products, Brownlee and Simisky were part of an exclusive set of employees that had access to the planning and confidential information of the underlying technology for the entire Genius product stack, as well as the designs and specifications of up to nine separate Genius products being planned.  Greer, as well, had extensive knowledge of these products given his role in strategic planning.  In other words, they had access to the crown jewels of SOCi's anticipated future product line.

7.      Additionally, Simisky was the head of the social media management product at SOCi, one of the key products that SOCi is largely considered a leader in, and that Yext had fallen behind in developing.  By recruiting Simisky, Yext has gained access to the blueprint of how to build SOCi's category leading product.

8.      As for Greer, he had extensive knowledge of, and electronic access to, confidential and trade secret information about SOCi's customers, potential customers, and related business strategies.  This included not just the customers' and potential customers' names and contact information, but also their account history, contract terms, details about how SOCi sold to those

customers, what the customers' pain points were, how SOCi overcame them, and the identity of the company's accounts that are at risk of potentially leaving its solution as well as SOCi's plans for addressing those customers' respective issues. His knowledge of SOCi's sales and marketing would be highly valuable to Yext in targeting SOCi's customers.

9. Yext's recruitment activity has been done with the intent of causing these Former Employees to breach their contractual, statutory, and common-law obligations to SOCi, all for the purpose of Yext wrongfully accessing SOCi's trade secrets. Even at this early stage, this fact is apparent because a *Yext insider has confirmed it*.

10. SOCi was recently contacted by a senior Yext executive (the "Senior Yext Employee"), who described themselves as being uneasy with Yext's nefarious actions and disclosure, use, and discussion of SOCi's confidential information and trade secrets. The Senior Yext Employee shared that Yext has, and intends to continue to, aggressively recruit dozens of SOCi employees, in many cases in knowing breach of the employees' non-compete obligations, by promising them outsized compensation, guaranteed payments and bonuses, and in some cases elevated titles. According to the Senior Yext Employee, Yext's primary goal is to gain access to SOCi's proprietary data and information.

11. For example, the Senior Yext Employee informed SOCi that on or about April 19, 2024, Yext had held an internal sales meeting in New York and via Zoom, which was attended by Yext's sales and product leaders, as well as by Greer and another former SOCi employee. At the meeting, Yext displayed on screen, in a presentation deck, details of SOCi's confidential customer information, which it had knowingly and improperly obtained from Greer. Greer and the other former employee then proceeded to provide additional details regarding what they had learned while employed by SOCi.

12.     Likewise, SOCi has heard multiple reports from its customers and potential customers that Yext is using the Former Employees' inside information to attempt to recruit those customers to Yext.  In some instances, Greer himself has recruited SOCi's customers (and has attempted to recruit some SOCi employees to join Yext as well), in breach of his continuing Non-Solicitation obligations to SOCi.

13.     SOCi has been unable to resolve the issue with Yext outside of court.  Yext responded to a letter from SOCi's counsel with assurances that the Former Employees were not using any of SOCi's confidential or trade secret information.  That claim was *false*, as the Senior Yext Employee's revelations dramatically underscore.  Yext will not stop absent judicial intervention because it is desperate to turnaround its sputtering growth.

14.     SOCi has been irreparably harmed by this unfair competition and trade secret misappropriation, and is entitled to damages and injunctive relief to prevent additional harm from accruing.

## THE PARTIES

15.     Plaintiff SOCi is a Delaware corporation with its principal place of business in California.

16.     Defendant Yext is a Delaware corporation with its principal place of business at 61 Ninth Avenue, New York, NY 10011.

## JURISDICTION AND VENUE

17.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*.  Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1338(b), because those claims are joined with substantial and related claims under federal law.

18.     The Court has personal jurisdiction over Defendant Yext because it is headquartered in and transacts business in New York state, and engaged in tortious conduct in the jurisdiction.

19.     Venue is properly laid in this Court pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events giving rise to the claims asserted herein occurred in New York.  Yext conducts substantial business in this District, and many of the acts and much of the conduct that constitute the violations of law complained of here, including Defendants' misappropriation of Plaintiff's trade secrets, occurred in this district.

<u>**FACTS**</u>

**A.     Overview**

20.     SOCi is a premier service provider offering digital marketing solutions for business, brands, and enterprises, and especially multi-location businesses.  Essentially, SOCi provides software that helps businesses manage, and now automate, their local digital marketing, including their local social media strategy, reputation management, and search-engine management.  Using SOCi's solutions, a business can increase its visibility in, and help ensure accuracy of, local search engine results, manage and respond to local reviews, integrate its local social-media profiles and plan the local publication of content, and capture, convert, and retain local clients, among other things.

21.     SOCi has been one of the Inc. 5000 Fastest Growing Companies in America for the last six years, and part of SOCi's technology stack represents Yext's largest competitor in this space.  A material amount of SOCi's revenue, and likely a majority of Yext's revenue, comes from overlapping and directly competing marketing solutions that each company offers, specifically, listings management, search optimization and reviews management.  Yext also claims to offer a social media management tool, but does not likely have significant revenue from this product as it

is generally deemed to be a vastly inferior solution to that of SOCi.  SOCi has these products, including more technologically advanced versions of them, and other product offerings that Yext does not have.

22.     SOCi has clients in all 50 states, and in multiple sectors, including retail, education, restaurants, financial services, healthcare, franchises, and real estate.  SOCi encourages employees to work remotely, and has employees located across the country and internationally.  The Former Employees with applicable non-competes worked for SOCi in states that enforce non-competes where, as here, they are targeted to a legitimate business purpose.[1]

### B.     The Former Employees Contractually Agreed Not To Compete With SOCi Post Employment, Not To Solicit SOCi's Customers, And To Maintain The Confidentiality Of SOCi's Proprietary Information

23.     As a condition of their employment, the Former Employees in the United States each signed an employment agreement (the "Letter Agreement"), and an Employee Inventions and Proprietary Information Agreement (the "Proprietary Information Agreement," and, together with the Letter Agreement, the "Employment Agreements").  The Employment Agreements detail various obligations the Former Employees each owed to SOCi, define terms essential to the protection of the company's trade secrets and confidential and proprietary information, and include restrictions on competition after termination of employment.

24.     Pursuant to the Proprietary Information Agreement, each of the Former Employees in the United States agreed not to compete with SOCi for a 1-year period after their employment with SOCi ended (the "Non-Compete").  Proprietary Information Agreement, ¶ 4(d).  The

---

[1]  Under the forthcoming FTC Non-Compete Clause Rule (which is not yet in effect), the non-competition provisions agreed to by Greer, Simisky, (and other senior SOCi employees) will remain enforceable, because the actions underlying the claims being made herein occurred, and continue to occur, prior to the Rule's effective date.  The Rule specifically excludes claims that accrued prior to its effective date.  16 CFR § 910.3(b).

prohibited "Competitive Activities" were limited situations involving employment that was substantially similar to the Former Employee's responsibilities at SOCi, that competes with SOCi, or that involves the use or disclosure of SOCi's Proprietary Information.  *Id.* ¶ 4(a).

25.     Each of the Former Employees also agreed not to solicit any SOCi employees or "Business Partners" for a 1-year period after their employment with SOCi ended.  *Id.* ¶ 4(d).  The Proprietary Information Agreement defines "Business Partner" to include present or perspective customers.  *Id.* ¶ 4(a).

26.     The Former Employees further agreed that if they breach the Non-Compete and/or Non-Solicitation, the restricted time period shall be "increased by the period of time beginning from the commencement of any violation of the foregoing provisions until such time as I have cured such violation."  *Id.* ¶ 4(d).

27.     The Former Employees each acknowledged and agreed that "the limitations as to time, geographical area and scope of activity to be restrained [by the Non-Compete and Non-Solicitation] are coextensive with the Company's footprint and my performance of responsibilities for the Company and are therefore reasonable and not greater than necessary to protect the goodwill or other business interests of the Company."  *Id.* ¶ 4(b)(ii).  They each further agreed "that such investments are worthy of protection and that the Company's need for protection afforded by this Section 4 is greater than any hardship I may experience by complying with its terms that these restrictions were reasonable in duration and geographic scope."  *Id.* ¶ 4(b)(ii).

28.     Thus, under the Proprietary Information Agreement, the Former Employees (except for Brownlee) are contractually restricted from accepting employment with a competitor such as Yext, or soliciting SOCi's customers or employees.  Each of such Former Employees was reminded of these obligations upon his or her departure from SOCi.

29.     The Former Employees also agreed to "hold in strict confidence and not directly or indirectly disclose or use any Proprietary Information" (the "Confidentiality" provision.) Proprietary Information Agreement ¶ 3(a).  Each of the Former Employees was reminded of these obligations upon their departure from SOCi.

30.     The term "Proprietary Information" includes all inventions, intellectual property, "all other financial, business, legal and technical information regarding or relevant to any Company Interest that is not generally publicly known," and "the identity of and any other information relating to the Company's employees, Affiliates and Business Partners intellectual property," that is developed, learned, or obtained in the course of employment, or that are otherwise received by or for the Company in confidence.  *Id.*  This obligation expressly continued post-employment.  *Id.*

31.     The Former Employees also specifically agreed that, upon termination of their employment, they would "promptly identify and, as directed by the Company, destroy, delete or return to the Company all items containing or embodying Proprietary Information."  *Id.* ¶ 3(b).

32.     Likewise, SOCi's Employee Handbook prohibits disclosure of any confidential information or trade secrets to anyone outside the Company without appropriate authorization.

33.     SOCi further emphasized the importance of confidentiality through annual trainings.

34.     Brownlee, who is a resident of Canada, is also subject to non-solicitation and confidentiality obligations.  Brownlee was hired through Deel Canada Services, Inc. ("Deel"), an employment agency, and signed an offer of employment and an incorporated Confidentiality and Intellectual Property Agreement (together, the "Employment Letter") with Deel as a condition of

his employment with SOCi.  Deel has assigned all of its rights, including enforcement rights, to SOCi.

35.     Yext knew about the Former Employees' Non-Compete, Non-Solicitation, and Confidentiality obligations before its recruitment activity began.  At a minimum, Yext became aware of these obligations when counsel for SOCi sent a cease-and-desist letter to Yext on April 19, 2024 (the "April 19 Letter").  Almost certainly, however, Yext was well aware of the restrictions far earlier.  Yext has its own employees sign non-competes and confidentiality agreements, and Yext has sued at least one competitor and a former employee for allegedly breaching those obligations.  Thus, Yext would have become aware of the terms of SOCi's employment contracts at the start of its recruitment process, or very soon after recruiting the first SOCi Former Employee.

### C.     The Former Employees Held Senior Positions At SOCi and Were Entrusted With SOCi's Most Confidential And Trade Secret Information Regarding Its Customers and Future Product Plans

36.     Each of the Former Employees was trusted with SOCi's most sensitive proprietary information and trade secrets.  In reliance on their contractual obligations, SOCi invited the Former Employees to key strategic meetings, entrusted them with technical information with respect to its emerging products and technologies, and shared access to customer and prospect data and other competitive information.  Yext purposefully recruited the Former Employees to gain access to these trade secrets, and it has already begun to use this information to unfairly compete with SOCi.

#### 1.     Stuart Greer

37.     Greer, who worked remotely from Michigan, began his tenure with SOCi on or about November 28, 2020, initially in the position of Enterprise Account Executive, Named Accounts.  He signed his Employment Agreements on November 24, 2020.  When he resigned

from SOCi on April 1, 2024, his position was Senior Director of Sales, and he also served as the head of SOCi's Regulatory Division, which focused on financial services and insurance customers. SOCi promptly reached out to Greer to remind him of his Non-Compete, Non-Solicit and Confidentiality obligations, and offered him a paid sabbatical if he would spend that time looking for a job with a company other than Yext to avoid a breach of his obligations, but he ultimately refused and said he would be joining Yext.

38.     As a senior sales leader at SOCi, Greer was invited to regular meetings with the executive team, including the CEO, to discuss strategic initiatives in the company, including many relating to its competition with Yext and strategies related thereto.  As part of the team that helped develop SOCi's sales, marketing and competitive positioning, Greer had intimate knowledge of SOCi's products, processes and sales methodologies.  As a senior sales leader, Greer was responsible for ultimately marketing and selling newly launched products, and as such would receive early access to new product innovations and roadmap disclosures, making Greer directly knowledgeable about the innovative and secret products that SOCi had in development, including SOCi's new innovative Genius product line (discussed further below).

39.     Further, as a senior sales leader, Greer had extensive knowledge of, and electronic access to, confidential and trade secret information about SOCi's entire customer base, potential customers, and related business strategies.  This included not just the customers names and contact information, but also their account history, details about how SOCi sold to those customers, what was sold and at what price, what the customers' pain points were, how SOCi overcame them, and details about what the customers are happy about and not happy about in working with SOCi ("Customer Information").  His access and knowledge also included SOCi's internal pipeline information, which includes information about which customers are buying, what they need, the

stage the parties are in the conversation (e.g., discovery, scope, pricing, or contracting), quoted pricing, and the like ("Pipeline Information").

40.     This Pipeline Information also includes prospects and prospect lists, which again includes not just the account names and contact information for potential customers that SOCi plans to or is attempting to contact, but also SOCi's internal information about where those potential customers are in the sales cycle, SOCi's conversation history with these potential customers, what their pain points are, and how SOCi is approaching the sale or retaining the customer ("Prospect Information").

41.     Greer also had knowledge of and access to SOCi's "critical accounts," namely, the identity of the company's accounts that are at risk of potentially leaving its solution, as well as SOCi's plans for addressing the customers' respective issues ("Critical Accounts Data" and the "CAP List").  Access to this information would give Yext powerful ammunition to unfairly target these vulnerable accounts.

42.     Likewise, Greer had knowledge of and access to non-public marketing materials like pitch decks, competitor battlecards, case studies, return-on-investment models and the like, and direct competitive comparisons, which are used to present and position SOCi and its products as superior to the competition ("Marketing Materials").  These documents are central to SOCi's sales momentum and the value that it delivers.  With Yext's access to this information, through the Former Employees, it could mimic SOCi's approach, and also prepare a counterapproach to target the same customers.  Greer had knowledge of SOCi's direct competitive comparisons, that if shared, could be used to unfairly prepare Yext to compete.  SOCi has spent millions of dollars over the years in creating the Marketing Materials, and they are considered to be highly confidential and a trade secret.

43.    The Customer Information, Prospect Information, Critical Accounts Data, Pipeline Information, and Marketing Materials are highly valuable information, maintained in confidence, not readily known or knowable outside the company, that SOCi spent an enormous amount of cost, time and effort accumulating, and are SOCi's trade secrets.  These items were entrusted to Greer in reliance on his Non-Compete, Non-Solicitation, and Confidentiality obligations, and Greer was compensated for these obligations not only with salary, bonuses, and multiple promotions but also with considerably equity in SOCi, a privately-held company.

44.    Access to this information, whether through the knowledge that the Former Employees carry, or through the documents that they apparently took with them to Yext (discussed below), is giving and will continue to give Yext a huge, unfair advantage in multiple areas, including knowing which customers are currently on the market in a buying cycle or even just open to a conversation, what their issues are, and how to position themselves against SOCi in trying to pull a customer away.

45.    On May 7, Greer publicly announced on LinkedIn that he was joining Yext as its Vice President of Sales, Financial Services and Insurance Division.  Although Greer would be working in the same subject areas as he did at SOCi and interacting with the same customers, this was a substantial move up in title and responsibilities.  Greer had been a first time manager at SOCi, and in his role was only the direct report for a fraction of the number of employees that he is responsible for at Yext.  SOCi has also learned that Yext offered Greer a salary more than 35% greater than what he was paid at SOCi, and significantly higher than standard market rates (and a similarly oversized bonus), all while Yext was planning to reduce its workforce by 200 or so people to cut expenses.  Given that Greer was minimally qualified for the role and his hiring was sandwiched around multiple rounds of layoffs, it is clear that Yext offered the salary and position

increase to induce Greer to breach his continuing obligations to SOCi and to gain access to the confidential information and trade secrets that Greer had learned at SOCi.

46.     Additionally, as Greer has shared with certain of his coworkers at SOCi, Greer is guaranteed certain income in the event that he should no longer be able to be employed by Yext, yet another fact demonstrating that Greer and Yext were both aware of the breaches of Greer's obligations in joining Yext.

47.     That same day, Greer trumpeted on LinkedIn that he was already hiring for Yext, thereby publicly inviting SOCi employees to join him: "Want to make money, build something great, and have a boss with an English accent? Well, you're in luck! I'm Hiring....If you just want the first two, other divisions of Yext are hiring 😊"  The brazenness of this announcement is indicative of Greer's lack of regard for his continuing obligations to SOCi.

48.     Moreover, as described further below, SOCi has confirmed that Greer is sharing SOCi's confidential information with Yext, who has already begun acting on this information, and soliciting SOCi customers.

### 2.  Chris Brownlee

49.     Chris Brownlee worked for SOCi as a Senior Director of Product Management, in charge of SOCi's "Reviews" product, and "Genius Reviews" product, the first in the line of SOCi's latest proprietary Genius products.  Product leads are akin to "mini-CEOs," in charge of all aspects of a product.  He started with SOCi on September 12, 2022, and worked from British Columbia, Canada.  He resigned by letter on March 4, and his last day was March 22, 2024.  He told his coworkers he was planning to join Yext.

50.     SOCi's "Reviews" product is its technology that allows SOCi's clients to manage their reputation, including by analyzing and responding to reviews left for their business across all

of their networks and locations.  SOCi has spent tens of millions of dollars developing and maintaining SOCi's Reviews product, and it is one of SOCi's top three revenue products and one of SOCi's competitive advantages over its competitors.

51.     As head of SOCi's "Reviews" product, Brownlee had extensive knowledge of SOCi's confidential and trade secret market and product analysis and business plans in this space, including SOCi's approach to how to architect the platform and build workflows specific for the multi-location industry, what issues are typically faced in connecting to networks and how SOCi has overcome those problems.  He also had access to confidential and trade secret Marketing Materials concerning this and other product lines. In consideration of his role and importance to the company, Brownlee was well-compensated and offered equity in SOCi.

52.     Brownlee was also product lead for SOCi's latest innovation of the Reviews product, Genius Reviews, the first version of which launched on April 27, 2023.

53.     SOCi is currently revolutionizing the online marketing-technology industry through its Genius AI products:  Genius Review, Genius Social, and its latest offering, Genius Search, with up to six more Genius products to come.  The proprietary Genius line integrates and leverages AI in a unique and proprietary way to deliver a combination of data analysis, actionable recommendations and automation that is unlike anything in the marketplace.  The Genius features have been in development for several years and carry a promise to change the way marketing is done for SOCi's target customer, allowing them to train SOCi's platform to highly automate and optimize their marketing at every location.  The Genius products have been developed at great effort and expense by SOCi, and the details were disclosed to SOCi employees on a need-to-know basis.

54.     As a key player in one of the first Genius products, Brownlee had access to extensive confidential and trade secret information not only about the Genius products that he led, but about all of SOCi's planned future releases and updates for the entire Genius platform, including the development details and planned features of various future Genius products. Confidential and trade secret information related to the Genius features includes all of the business plans, including the types of products in development, what problems they will address and how, which features they will automate, product features and innovations, release dates, market and product analysis, SOCi's approach to building workflows, how to leverage artificial intelligence, and the identity of typical issues faced in all of the above and how SOCi has overcome and plans to overcome those problems.

55.     Although Genius Review, Genius Social, and Genius Search have all been publicly announced, the details of how they were built and the proprietary processes and algorithms that make them work are not publicly known.  Further, SOCi already has in place detailed developmental plans for upgraded features for each of these products to be released soon. Confidential and trade secret information related to these products include the types of features planned for future releases, and the release schedule, as well as the related developmental details. Information about SOCi's products, and its Genius line, were entrusted to Brownlee in reliance on his Non-Solicitation, and Confidentiality obligations.

56.     On or about June 5, 2024, it was announced that Brownlee was becoming Yext's Head of Product as part of a restructuring.  Given this elevated position, it would be impossible for Brownlee not to disclose his knowledge of SOCi's proprietary information and trade secrets, particularly with respect to the Genius product line.

57.     As with Greer, Brownlee was hired for a position for which he was minimally qualified, and despite the dearth of experience and Yext's ongoing layoffs, was paid well-above the market rate (and 50% or more than what he was paid at SOCi) for someone with his skillset and experience.  Again, this demonstrates that Yext was offering this lucrative compensation package to gain access to the trade secrets and confidential information that Brownlee possesses and will inevitably disclose in his role.  In other words, Yext offered the salary and position increase to induce Brownlee to breach his continuing obligations to SOCi.

### 3.  Jenette Simisky

58.     Jenette Simisky worked for SOCi as a Senior Director of Product Management, in charge of SOCi's "Social" product and "Genius Social," one of SOCi's proprietary Genius products.  She signed her Employment Agreements on November 9, 2022, started with SOCi on or about December 5, 2022, and worked remotely from Massachusetts.  Her last day at SOCi was May 17, 2024, and on her resignation Simisky would not disclose where she was going to be employed next, although she later informed individuals at SOCi she was joining Yext.  SOCi understands that, much like with Greer and Brownlee, Yext offered Simisky outsized compensation to entice her to violate her continuing obligations to SOCi.

59.     SOCi's "Social" product is its technology that allows SOCi's clients to manage their social media presence, including tasks such as distributing content, but also analyzing what does and does not work.  SOCi is well known to be a leader in the social media management space, and its solutions have won numerous awards.  As head of SOCi's "Social" product, Simisky had extensive knowledge of SOCi's confidential and trade secret market and product analysis and business plans in this space, including SOCi's approach to architecting the platform and building

workflows specific for the multi-location industry, and the complex issues that are typically faced in connecting to networks and how SOCi has overcome those problems.

60.     On June 10, 2024, Yext announced its intention to acquire a company that does have a Social product, but that product is built to service a narrow set of customers.   Yext confirmed during its earnings call on that same day that they still intend to build their own Social product.   By recruiting Simisky, Yext can access her vast knowledge of SOCi's products and approach.   The Social product represents a sizable portion of SOCi's revenue, is one of its differentiators and competitive advantages, and thus makes up a significant part of SOCi's enterprise value.

61.     Simisky was also the product lead for SOCi's latest proprietary social media management product, Genius Social, the first version of which launched on December 14, 2023, and was further the product lead for other in-development Genius products that have not been publicly announced.   As a key player in one of the first Genius products, Simisky, like Brownlee, had access to (and brings with her to Yext) extensive confidential and trade secret information and intellectual property not only about the Genius products that she led, but about all of SOCi's planned future releases and updates for the entire Genius line of products, including the development details and planned features.   Information about SOCi's products, and its Genius line, items were entrusted to Simisky in reliance on her Non-Compete, Non-Solicitation, and Confidentiality obligations.   According to what Simisky told her co-workers, SOCi understands that Yext also offered Simisky a substantial salary increase to induce her to breach her continuing obligations to SOCi.

### 4.  Other Former Employees

62.     Yext has also successfully recruited multiple other Former Employees with valid and enforceable Non-Competes.  This includes Keith Hadelman, who worked for SOCi remotely from Georgia as a Global Account Director, reporting to Greer, whose final day at SOCi was April 8, 2024.  A few weeks later, he announced on LinkedIn that he had joined Yext as the Director, Enterprise (Financial Services & Insurance), which would mean he likely works in substantially the same subject area as he did at SOCi despite his valid and enforceable Non-Compete.  Hadelman brings with him to Yext much of the same confidential and trade secret customer and account information that Greer does.

63.     Megan Menesale, who worked for SOCi as the Director of Product Marketing, also joined Yext in early 2024, despite a valid Non-Compete.  As the Director of Product Marketing, Menesale was privy to sensitive and highly-confidential information about SOCi's new product development.  She was terminated on June 7, 2023, effective June 30, 2023.  At Menesale's request, on October 25, 2023, SOCi agreed to a partial release of Menesale's non-compete obligations (the "Partial Release") and limited the non-compete obligations to only a few "key competitors," one of which was Yext.  Despite SOCi's cooperation with Menesale's request, Yext hired Menesale, where she is believed to be working in a substantially similar subject area. Menesale has also reached out to at least one SOCi employee, a former colleague, asking that person to share SOCi's confidential materials, and SOCi believes that Menesale has shared with Yext the names of key individuals to target for recruitment.

64.     Yext has also targeted numerous other SOCi employees.  Yext has recruited or attempted to recruit at least one other product lead for the Genius line of products, a member of SOCi's business development team, a salesperson, multiple members of the customer success team, and numerous other employees.

**D.     Yext Targets SOCi Employees For Recruitment And Tortiously Interferes With The Employment Contracts To Gain Access To Their Confidential And Trade Secret Information**

65.     For years, SOCi and Yext have been the two leaders in the marketing technology space, targeting the same pool of customers, and offering similar competing products and solutions.  Timely innovation has long proved key to maintaining a competitive advantage in the industry.

66.     On December 14, 2023, SOCi launched the first of its long-planned Genius line of products that fully integrate artificial intelligence into its technology stack and enables full automation of certain tasks, Genius Reviews, followed by Genius Social on April 27, 2024.

67.     The successful launch of Genius put Yext on notice that it was lagging behind in the arms race to provide prospective customers with cutting-edge technology that would revolutionize marketing across every industry.  Yext's aggressive recruitment campaign of SOCi employees, particularly those with extensive knowledge of the Genius products, began soon afterward.

68.     Faced with this competition from SOCi, approximately five months ago Yext called an executive meeting and resolved to target SOCi and disrupt SOCi's business and its momentum in the highly competitive marketing technology market.  SOCi recently learned about this initiative from the Senior Yext Employee, who was concerned about the manner in which was targeting SOCi and attempting to gain access to its trade secrets.

69.     Yext was well aware that many of SOCi's employees have contractual obligations that would bar them from jumping to a competitor.

70.     Despite those contractual obligations, Yext set out to target and heavily recruit SOCi employees, particularly the product heads with knowledge of the Genius features and the sales heads with intimate knowledge of SOCi's customers.  None of the positions that Yext was

recruiting to fill were advertised publicly. Rather, Yext was surreptitiously targeting specific SOCi employees to gain access to their knowledge of SOCi's confidential and trade secret information.

71.     According to information gained from certain employees that were approached, Yext has used aggressive recruitment tactics, including offering compensation packages that far exceed market rates, in some cases by 50% or more. Yext is purposefully overpaying these employees, and in some cases giving them guarantees and bonuses as well as outsized roles relative to their experience, at the same time that it has been engaged in multiple rounds of layoffs.

72.     For example, Greer was never a sales manager before SOCi, and at SOCi he had less than two years of sales management experience. Yet, he is now the VP of Sales of one of the largest divisions in Yext (a division that he has bragged to a SOCi colleague to be "larger than all of SOCi"). Similarly, Brownlee only rose to the level of Senior Director of Product Management at SOCi. According to an email from Yext's CEO that has been recently published, "Brownlee will now lead the product team" of Yext, a public company four times the size of SOCi.

73.     The oversized compensation, guarantees, roles, and titles seem specifically designed to entice SOCi's employees to breach their contracts, and reflects not the employees' market value to the company, but rather the value of SOCi's proprietary information that the employees will bring with them. To put it another way, Yext is paying the Former Employees not for their skills, but for sharing SOCi's confidential and trade secret information with Yext.

74.     Yext is well aware that it is enticing SOCi's employees to breach their obligations to their employer. Yext has offered to, and has, covered their legal expenses associated with those breaches. Indeed, on May 3 (the "May 3 Letter"), counsel for Yext responded to SOCi's April 19 Letter, as well as cease and desist letters sent to Brownlee, Greer, and Menesale, "on behalf of Yext and each of the employees who received such letters."

75.     SOCi also understands that Yext has agreed to pay Greer, and perhaps others, a substantial severance if he becomes unable to continue working for Yext due to an injunction.  In other words, both Yext and Greer fully knew about, and intended to breach, Greer's Non-Compete and his other continuing obligations to SOCi.

### E.     Yext Begins Using SOCi's Trade Secret And Confidential Information

76.     Despite Yext's counsel's written assurances that it would not use SOCi's trade secret or confidential information, SOCi has learned that Yext has already begun using SOCi's trade secret and confidential customer information, in multiple public ways.  And, given the extensive knowledge of SOCi's trade secrets that each of the Former Employees holds, it is inevitable that they will continue to disclose SOCi's trade secrets to Yext.

77.     As described above, SOCi has been privately and confidentially developing its Genius features, including Genius Search, which was released on May 22, 2024.  This release date had been established internally at SOCi for several months, and was shared with company employees such as Greer, Simisky, and Brownlee – like other details about the Genius features – on a strictly need to know basis.

78.     Eight days before Genius Search was to be publicly revealed, Yext posted a press release to their website for product called "Listings Recommendations," to apparently compete with (and pre-empt) SOCi's then-secret Genius Search feature.  The timing of this release, and the described features, demonstrate to SOCi that Yext likely learned details of Genius Search from the Former Employees.

79.     Yext most likely does *not* have a similar product on offer, and only released this press release for Listings to undercut the impact of the then imminent SOCi Genius Search release and so Yext could (incorrectly) tell potential customers that they offered a product similar to

Genius Search.  Yext has not disclosed or previewed in any way how the product actually works, either at the Yext Summit or since, indicating that it does not have any such product ready for market.

80.     SOCi's suspicions were confirmed on or about June 5, 2024, when the Senior Yext Employee revealed to SOCi that Brownlee had disclosed to other Yext employees detailed documentation about the Genius products, including highly confidential product decks and pitch decks.  These types of documents contain highly confidential and sensitive information about Genius, such as features, competitive differentiators, workflows and processes, and further details of how the product works, to a level that could enable another product and engineering team to recreate much of the technology.

81.     Yext now has access to SOCi's trade secret and confidential information about Genius product development, including new versions for Genius Search, Social, and Reviews, as well as new products that have not been publicly identified, such as product roadmaps, lists of features, technology, sticking points, and solutions.  SOCi has spent millions in time and money developing its new line of Genius products, and stands to suffer extensive damages if this information is leaked to its competitors.  Yext can use the confidential and trade secret information it induced the Former Employees to steal and divulge to aid Yext in its attempt to recreate SOCi's Genius features, even though most of those employees should not even be working for Yext in the first place given their non-competes.

82.     SOCi has also become aware of multiple instances where Yext has used its knowledge of SOCi's trade secret and confidential customer information to solicit SOCi's customers.  In some instances, that solicitation has been by Greer, causing him to breach his Non-Solicitation obligations.

83.     In mid-May, Greer informed a SOCi employee and former colleague that he was visiting two of SOCi's biggest existing customers in the Detroit area, Customers A and B, to pitch them to join Yext.

84.     The solicitation of SOCi's customers violates Greer's Non-Solicitation obligation, but it is also clear that he is using, on behalf of Yext, SOCi's confidential and trade secret information to try to solicit these customers.   For example, Customer A was a beta customer for SOCi's Genius Social product – meaning they had confidential access to the product on a "test" basis, before the product was fully ready for its release.   As of about two months ago, Customer A noted specific problems with the product, such as that it did not suggest enough images, and the images were tagged incorrectly.   Both Brownlee and Greer knew about these issues Customer A was having, in their product and sales roles at SOCi.   When Greer reached out to Customer A, Greer described to Customer A the exact problem Customer A had been having with the images with the Beta implementation, and used that information to attempt to pitch Yext as an alternative. These problems had since been resolved as the product was more fully developed and almost ready for launch.   Customer A then told SOCi about this interaction.

85.     Customer C also reported to SOCi's sales manager on its account that Greer had reached out to them, as well, to pitch Yext.

86.     Greer, on behalf of Yext, has also been targeting SOCi's "Pipeline" customers (aka customers that have been pitched by SOCi and are potential customers), most likely using SOCi's trade secret Pipeline Information documents or retained information to target these customers.   In many cases Greer had personally participated in pitching these customers on SOCi's behalf, attending in person meetings just weeks before leaving SOCi, and then used that information he learned on the pitch on Yext's behalf.   Some of these prospects are currently customers of Yext,

and by knowing which customers SOCi is speaking with or pitching, Yext has an unfair advantage in its ability to get ahead of any competitive displacement activity by renewing customers early, offering discounts, or otherwise addressing issues they would not have otherwise given or addressed had they not had this information.

87.    For example, prior to leaving, Greer had attended in-person meetings with three potential customers, who were then currently customers of Yext, to pitch them to join SOCi at their next renewal date, which was still several months away.  After Greer joined Yext, suddenly Yext offered these customers to renew several months ahead of schedule, at a steep discount.  In at least one instance, Greer was directly involved in pitching this customer on behalf of Yext, which SOCi learned about when the customer accidentally sent a meeting invitation to Greer's old SOCi email address.  At least one other customer had selected SOCi as vendor of choice, but on or about June 5, it informed SOCi that Greer had contacted them on behalf of Yext, and now they were reconsidering.

88.    On behalf of Yext, Greer has also been contacting SOCi's existing customers from SOCi's highly confidential and trade secret Critical Account Program ("CAP") list, which is information about all of SOCi's customers with open issues, descriptions of those issues and of SOCi's plans to resolve them.  This information is shared only with SOCi's leadership team, on a need-to-know basis, and Greer had access to it while at SOCi.  At least one of those customers, Customer D, reported to SOCi that Greer had called them and suggested they look to Yext as an alternative, using extensive knowledge of the issues that customer was having.

89.    Customer D, as well as multiple other customers and potential customers, have also reported to SOCi that Yext has been spreading lies about SOCi, including that SOCi is in financial distress, and that it has lost significant numbers of employees or customers.  None of that is true,

as Yext is fully aware.  These falsehoods, which have apparently been spread over the past five months, are defamatory on their face, because they disparage SOCi's health as a business and brings into question its ability to continue forward as a business partner or potential business partner.

90.    Yext is also using SOCi's confidential and trade secret information to target SOCi's multi-location restaurant clients that are also doing business with a menu management supplier and partner of SOCi (the "Menu Management Partner").  The partnership allows the Menu Management Partner's customers to publish changes, for example new hours of operations or menu items, to both sources simultaneously.  The Menu Management Partner also cross-sells SOCi's products to relevant customers and offers "white label" versions of SOCi's products.

91.    In the past few weeks, SOCi has heard from several of its enterprise-restaurant customers that Yext has been contacting them with detailed knowledge of their relationship with SOCi and the Menu Management Parter, pitching Yext instead, and offering to buy out their contracts with SOCi.  This activity only started after the Former Employees joined Yext, thus demonstrating that the Former Employees revealed which SOCi customers also work with the Menu Management Partner.

**F.    SOCi Has Suffered and Will Continue To Suffer Irreparable Harm**

92.    In sum, Yext is aggressively recruiting and hiring senior-level SOCi employees with valid Non-Competes and extensive knowledge of SOCi's trade secret and confidential customer and product information, and is using that information to unfairly compete by targeting SOCi's customers and potential customers, and apparently either stealing SOCi's technology or using SOCi's know-how as a short cut to unfairly develop its own.

93.     SOCi has suffered, and will continue to suffer, irreparable injury because the Former Employees are in a position to share SOCi's confidential information with Yext, and to use that information to benefit Yext and unfairly compete with SOCi, and have already begun to do so.

## FIRST CAUSE OF ACTION
### Tortious Interference with Contract Under New York State Law

94.     SOCi repeats and realleges each and every allegation set forth above as if fully set forth herein.

95.     SOCi has valid and enforceable employment agreements containing valid and enforceable Non-Compete, Non-Solicitation, and Confidentiality provisions with its Former Employees as described above.

96.     SOCi required each Former Employee to sign an Employment Agreement, including the Non-Compete, Non-Solicitation, and Confidentiality provisions because, as each acknowledged in writing, any failure to protect SOCi's confidential and proprietary information, including its trade secrets, would cause irreparable harm to Plaintiff.  The cause of such harm is clear and easily discernible: by joining SOCi's main competitor, a former SOCi employee would provide Yext with an unfair competitive advantage based on the exploitation of knowledge and resources the employee had access to while working for SOCi.

97.     Yext has at all relevant times been aware of the relevant Former Employee's Non-Compete, Non-Solicitation, and Confidentiality obligations.  At a bare minimum, it was aware by no later than April 19, 2024.

98.     The Former Employees in the United States have valid and enforceable Employment Agreements, including continuing Non-Compete, Non-Solicitation, and

Confidentiality obligations.  Brownlee has a valid and enforceable employment agreement, with continuing Non-Solicitation and Confidentiality obligations.

99.     Yext intentionally caused the Former Employees to breach their Employment Agreements by, among other things, aggressively recruiting them, hiring them, and continuing to employ them in roles that involve substantially similar subject matter, product development, and prospective and current customers to those they held at SOCi.  It further intentionally caused the breaches by causing, encouraging, or allowing the Former Employees to share and use SOCi's confidential and trade secret information while at Yext, and to solicit SOCi's customers or prospective customers and current employees.

100.     Yext ensured that it could lure away the Former Employees by offering compensation (to at least some of them) that is significantly higher than what they earned at SOCi or what is market standard (in some cases 50% or more), and with titles and roles that are beyond their experience level.  The additional "value" Yext is paying for is the Former Employee's knowledge of SOCi's trade secrets and confidential information.  Offering substantially above-market compensation, guarantees, titles, and roles (unavailable anywhere else for these employees) for the sole purpose of gaining access to SOCi's confidential and trade secret information evidences the impropriety of Yext's conduct, and also serves to demonstrate that Yext's actions were unjustified.  The clear motive was to gain access to SOCi's confidential and proprietary information through malicious means and bad faith.

101.     Yext's intentional inducement caused each of the Former Employees to knowingly violate their Employment Agreements.  None of the Former Employees would have breached their Non-Competes by joining SOCi's biggest competitor if not for the actions of Yext.  These actions include aggressively recruiting the Former Employees, offering to cover, and covering, the Former

Employee's legal expenses, and hiring the Former Employees knowing that doing so would cause the Former Employees to breach their Non-Competes.

102.    Nor would any of the Former Employees have breached their Non-Solicitation or Confidentiality obligations if not for the actions of Yext – in fact, these breaches occurred after the Former Employees joined Yext, or in anticipation of their joining, and were done at Yext's instruction and direction.

103.    SOCi has suffered, and will continue to suffer, extensive damages as a result of Yext's conduct in an amount to be proven at trial.

104.    SOCi is also entitled to injunctive relief to enjoin Yext from further employing the Former Employees in positions that compete with SOCi for a period of time as specified in the Tolling Provision.

**SECOND CAUSE OF ACTION**
**Trade Secret Misappropriation Under New York State Law**

105.    SOCi repeats and realleges each and every allegation set forth above as if fully set forth herein.

106.    As set forth above, Yext has improperly acquired from the Former Employees, and used, SOCi's trade secret information, thereby misappropriating SOCi's trade secrets.  The trade secrets misappropriated by Yext include information regarding SOCi's customers, business plans, product-development plans, marketing strategies, and other proprietary information and/or commercially sensitive information that was secret, valuable in the industry, and had not been disclosed to anyone outside SOCi.

107.    SOCi's trade secret information was trade secrets at the time of Yext's misappropriation.

108.    As disclosed to SOCi by the Senior Yext Employee, and based on the customer detail presented onscreen in the "New York meeting" and the level of product detail in Yext's Listing Recommendations press release, it is clear that Yext has obtained documents containing SOCi's trade secrets from its Former Employees, but at a minimum those Former Employees have shared and will continue to share SOCi's trade secrets based on their own knowledge.

109.    The aforementioned information qualifies as "trade secrets" under New York state law.  Furthermore, SOCi has taken reasonable measures to keep such information secret by, among other things, restricting access to such information and requiring employees to execute confidentiality agreements like the one the Former Employees executed.  The Former Employees and Yext were well aware that such information was confidential.

110.    The trade secrets misappropriated by Yext, through the Former Employees, include highly confidential information which required substantial resources, time, and investment by SOCi to create and/or develop.  SOCi derives independent economic value from them not being generally known to, or readily ascertainably by, those who can obtain economic value from use of this information, such as SOCi's competitors.

111.    Yext has used the improperly acquired trade secrets to target SOCi's customers and potential customers and to announce and to get an unfair head start in developing technology to compete with the Genius features.

112.    Yext's misappropriation of SOCi's trade secrets will cause SOCi to suffer harm, including but not limited to the loss of clients, loss of reputation and customer goodwill, and loss of the confidentiality of, and investment in, its trade secrets.

113.    Yext's actions were gross and wanton, and constitute willful and malicious misappropriation of SOCi's trade secrets pursuant to New York State Law.

**THIRD CAUSE OF ACTION**
**Violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, et seq.**

114.     SOCi repeats and realleges each and every allegation set forth above as if fully set forth herein.

115.     SOCi operates its business in interstate commerce across the United States.  The trade secrets misappropriated by Yext, Greer, and Brownlee are related to, and intended for use in, interstate commerce.

116.     As set forth above, Yext improperly acquired, viewed, and used SOCi's trade secrets and confidential information, thereby misappropriating SOCi's trade secrets pursuant to 18 U.S.C. § 1839(5)(A).  The trade secrets misappropriated include information regarding SOCi's business plans, customers, marketing strategies, technologies for AI and other proprietary information and/or commercially sensitive information that was secret, valuable in the industry, and had not been disclosed to anyone outside of SOCi.  The aforementioned documents and information qualify as "trade secrets" under the DTSA, as defined in 18 U.S.C. § 1839(3).

117.     SOCi has taken reasonable measures to keep such information secret by, among other things, requiring employees to execute Employment Agreements like the ones the Former Employees signed, and reminding the Former Employees of their contractual obligations upon resignation.  Further, it is inevitable that Greer, Brownlee, Simisky, and, perhaps, other Former Employees, will disclose their extensive knowledge of SOCi's trade secrets to Yext because they are working in similar subject areas and Yext is a direct competitor to SOCi.

118.     The trade secrets misappropriated by Yext include highly confidential information which required substantial resources, time, and investment by SOCi to create and/or develop. SOCi derives independent economic value from them not being generally known to, or readily

ascertainably by, those who can obtain economic value from use of this information, such as SOCi's competitors.

119.    Yext's misappropriation of SOCi's trade secrets will cause SOCi to suffer harm, including but not limited to the loss of clients, loss of reputation and customer goodwill, and loss of the confidentiality of, and investment in, its trade secrets.

120.    Yext's actions constitute willful and malicious misappropriation of SOCi's trade secrets pursuant to the DTSA.

**FOURTH CAUSE OF ACTION**
**Unfair Competition Under New York State Law**

121.    SOCi repeats and realleges each and every allegation set forth above as if fully set forth herein.

122.    Yext has engaged in unfair competition by, among other things, initiating a campaign to raid and aggressively recruit senior SOCi employees, with extensive knowledge of SOCi's customers and product-development plans and processes, and participating with the Former Employees in a scheme to acquire a "knowledge transfer" from them that is derived from and unavoidably incorporates SOCi's confidential information without authorization from SOCi, which violates the unambiguous terms of the Employment Agreements. Yext is now using the knowledge learned from those employees to unfairly target SOCi's customers and potential customers, and to unfairly compete in the marketplace with technology either modeled on, or stolen from, SOCi. Yext can also use the Former Employee's knowledge of SOCi's confidential information to unfairly "fast forward" the development of products competing with Genius by, for example, avoiding known potential pitfalls or focusing on features that appeal best to customers.

123.    Yext has also attempted to gain an unfair advantage by lying to current and prospective SOCi customers about SOCi's economic status, the quality of its products, and the company's outlook for its longevity in the industry.

124.    As a direct and proximate result of Yext's conduct, SOCi has been damaged in an amount to be proven at trial.  SOCi has also incurred, and will continue to incur, additional damages, costs, and expenses, including attorneys' fees, as a result of Yext's misappropriation.

125.    Further, as a result of the aforesaid actions by Yext, SOCi has suffered and will suffer economic and immediate and irreparable harm to its business.  Money damages alone are inadequate to fully compensate SOCi for the incalculable loss of its competitive advantage, good will, and confidential information caused by Yext's wrongful acts.  Unless Yext is enjoined from employing the Former Employees, and thereby achieving the aforementioned knowledge transfer, and enjoined from further using SOCi's confidential information, SOCi will suffer irreparable and incalculable harm, including competitive harm regarding SOCi's goodwill customers, marketing plans, business plans, and product-development plans, for which it can never be compensated.  No adequate remedy at law exists for such misconduct.

## **RELIEF REQUESTED**

WHEREFORE, SOCi respectfully request that judgment be made and entered against Yext as follows:

A.  AS TO ALL CAUSES OF ACTION, an award granting SOCi monetary damages, the precise amount to be determined at trial;

B.  An award granting SOCi punitive damages;

C.  Preliminary and permanent injunction, whereby Yext would be enjoined from

   a.  hiring Simisky, if she has not already started;
   b.  continuing to employ Greer, Simisky, or Brownlee, or any other Former Employee in any role that would constitute a violation of their Non-Solicitation, Confidentiality, and/or Non-Compete obligations, until the full expiration of the

term of their continuing obligations, plus tolling for the time spent employed by
Yext; and

c. using or disclosing any confidential information or trade secrets belonging to
SOCi, unless generally known in the trade or industry in which Yext is engaged
or ascertained from public sources;

D. Costs of suit, pre-judgment and post-judgment interest in the maximum amounts allowed
by law;

E. Attorneys' fees;

F. Exemplary damages in a sum to be determined by the Court and finders of fact in an
amount reasonable and necessary to punish Defendant for its willful, malicious and
wrongful conduct, and to deter future misconduct; and

G. Judgment granting Plaintiff such other and further relief as the Court may deem just,
equitable, and proper.

Dated: New York, New York          Respectfully submitted,
        June 13, 2024
                                   **GLENN AGRE BERGMAN & FUENTES LLP**

                                   By: _/s/ Reid Skibell_
                                   Reid Skibell
                                   Edward E. Shapiro
                                   1185 Avenue of the Americas, 22nd Floor
                                   New York, NY 10036
                                   rskibell@glennagre.com
                                   eshapiro@glennagre.com
                                   Tel: (212) 358-5600

                                   Lyn R. Agre (*pro hac vice* application forthcoming)
                                   44 Montgomery Street, Suite 2410
                                   San Francisco, CA 94104
                                   lagre@glennagre.com
                                   Tel: (415) 599-0881

                                   *Attorneys for Plaintiff*

## **VERIFICATION OF COMPLAINT**

I, Falk Gottlob, pursuant to 28 U.S.C. ¶ 1746, hereby declare as follows:

I am the Chief Product Officer of Plaintiff SOCi, Inc. in this action.  I have reviewed the contents of this complaint and verify that the statements contained herein are true to the best of my knowledge, except as to matters alleged on information and belief, and as to those matters, I believe them to be true.  I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on June 12, 2024

DocuSigned by:

*Falk Gottlob*

D8586F2BF8D747A...

Falk Gottlob
Chief Product Officer
SOCi, Inc.