# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SOCi, Inc.,<br><br>    *Plaintiff*,<br><br>  v.<br><br>Yext, Inc., Stuart Greer, Chris Brownlee, Jenette Simisky, Megan Menesale, and Keith Hadelman,<br><br>    *Defendants*. | Case No. 1:24-cv-04530 (RA) |

**DECLARATION OF FALK GOTTLOB IN SUPPORT OF**
**PLAINTIFF SOCI, INC.'S APPLICATION FOR**
<u>**EXPEDITED DISCOVERY**</u>

  I, Falk Gottlob, pursuant to 28 U.S.C. § 1746 and upon penalty of perjury, declare as follows:

  1. I am a resident of the State of California, over the age of 18, and competent to make this declaration. I could and would testify as to the matters set forth herein, if called upon to do so.

  2. I am the Chief Product Officer at SOCi, Inc. ("SOCi"). I submit this declaration in support of SOCi's application for expedited discovery (the "Application").

  3. No prior application for the relief sought herein has been requested by SOCi.

  4. SOCi's Application is supported by its amended complaint (the "Amended Complaint") and its memorandum of law in support of its motion for expedited discovery, both of which set forth facts clearly showing that SOCi is at risk of suffering further immediate and irreparable injury if Defendants Yext, Inc. ("Yext"), Stuart Greer, Chris Brownlee, Jenette Simisky, Keith Hadelman and Megan Menesale (these individuals are collectively, the "Former Employees" or "Individual Defendants") are not restrained from using SOCi's trade secret and

1

confidential information, and if the Individual Defendants are allowed to continue to work for Yext in flagrant violation of their contractual obligations to SOCi. Yext is a direct competitor of SOCi, and it has raided SOCi's senior employees with knowledge of SOCi's innovative Genius product line, in an effort to use SOCi's trade secrets to develop a competing product.

## BACKGROUND OF SOCI AND YEXT

5.  I joined SOCi in May 2023. As Chief Product Officer, I am involved in all aspects of SOCi's business. My role requires me to have knowledge and insight into the technology SOCi is developing, its overarching business and marketing strategy, the company's customer base and efforts to expand that base, and SOCi's plans to ensure that it maximizes its competitive advantage relative to its competitors.

6.  SOCi is a premier service provider offering digital marketing solutions for businesses, brands, and enterprises, and especially multi-location businesses – *a.k.a.* businesses that drive revenue through numerous local stores, advisors, agents, or other local representatives. Essentially, SOCi provides software that helps businesses manage, and now automate, their digital marketing, including their social media strategy, reputation management, and search-engine management. Using SOCi's solutions, a business can increase its visibility in, and help ensure accuracy of, search engine results, manage and respond to reviews, integrate its social-media profiles and plan the publication of content to capture, convert, and retain clients, among other things.

7.  SOCi considers Yext to be its largest competitor. For years, SOCi and Yext have been the two leaders in the marketing technology space: targeting the same pool of customers and offering similar competing products and solutions. Timely innovation has proved key to maintaining a competitive advantage in the space.

8. On December 14, 2023, SOCi earned a significant competitive advantage with the launch of Genius Reviews, the first of its long-planned Genius line of products that fully integrate artificial intelligence into its technology stack and enables full automation of certain tasks. SOCi subsequently launched Genius Social on April 27, 2024, and Genius Search on May 22, 2024, with more Genius products to come.

9. The proprietary Genius line delivers a combination of data analysis, actionable recommendations, and automation that is unlike anything in the marketplace. The Genius features have been in development for several years and carry a promise to change the way marketing is done for SOCi's target customer, allowing them to train SOCi's platform to highly automate and optimize their marketing at every location.

10. As the Amended Complaint explains, SOCi's technological innovations related to its Genius products, SOCi's related business strategies, as well as the identity of SOCi's clients or potential clients and details of the client relationship, are all considered highly confidential and proprietary. SOCi takes reasonable measures to protect the secrecy of the information it considers proprietary, including by having employees contractually agree to keep this material confidential in their employment agreements, maintaining sophisticated IT security and infrastructure, utilizing unique user IDs and strong passwords, and restricting access to meetings and sensitive documents to those on a need-to-know basis.

11. In April 2024, SOCi learned that Yext was strategically recruiting senior-level SOCi employees. SOCi's discovery of this plot arose in part out of conversations a co-worker had with former SOCi employee Stuart Greer, as well as conversations I had subsequently with SOCi employees who were being recruited by Yext but chose to remain with SOCi. Additionally, I was directly involved in SOCi's internal investigation of Yext's targeted recruitment efforts and its plot

to steal SOCi's trade secrets and confidential information. What I learned during the investigation provides the basis for certain facts in this Declaration.

12.  I am familiar with each of the Individual Defendants and can attest that each worked at SOCi in a role that afforded them significant access to and knowledge of SOCi's trade secrets and confidential information. Though their roles and seniority vary significantly, the mere fact that any of them are working for Yext in roles similar to the ones they occupied at SOCi will inevitably result in harm to SOCi, due to the fact that the confidential information and trade secrets they learned during the course of their employment with SOCi will unquestionably be divulged.

### THE FORMER EMPLOYEES HAD ACCESS TO SOCI'S TRADE SECRETS AND CONFIDENTIAL INFORMATION

13.  Stuart Greer was hired by SOCi in 2020 and worked remotely from Michigan. As the head of SOCi's Regulatory Division, Mr. Greer was the most senior of the Former Employees and has a deep knowledge of critical aspects of SOCi's business. Although he did not work for me, Mr. Greer would often attend meetings with company executives, including SOCi's CEO. Mr. Greer had extensive access to and knowledge of SOCi's confidential and trade secret information about its customers, such as customer's names and contact information, but also their account history, details about how SOCi sold to those customers, what the customers' pain points were, how SOCi overcame them, details about what the customers are happy about and not happy about in working with SOCi, similar information about potential customers, and customers in the "pipeline" that SOCi is currently pitching.

14.  In his role, Mr. Greer cultivated SOCi's goodwill and forged relationships with current and prospective customers, learning valuable information about the market on SOCi's behalf. Additionally, Mr. Greer was uniquely positioned to get feedback from customers about SOCi's marketing strategies and its product offerings. SOCi invests significantly in developing

4

these relationships and extracting this valuable information from its customers and prospective customers, and Mr. Greer retains critical knowledge and connections earned during his time as an employee of SOCi.

15. In April, Mr. Greer informed my co-worker that he was considering resigning from his role at SOCi and was exploring other options. Though he did not state that he would be joining Yext, SOCi attempted to persuade him to stay with the company. However, Mr. Greer eventually divulged that his likely destination was going to be Yext. Upon learning this information, multiple SOCi executives – including the CEO – spoke with Mr. Greer and offered alternatives that would prevent the breach of his non-compete and reminded him of his contractual obligations. Though Mr. Greer told SOCi's CEO Afif Khoury that he would consider the options over the weekend, SOCi was soon informed that Mr. Greer had decided to resign and join Yext. I have subsequently learned that Mr. Greer was offered compensation significantly above the market rate, along with other guarantees and assurances that he will continue to be compensated in the event that a preliminary injunction against him or Yext prevents him from working for Yext.

16. Keith Hadelman was hired by SOCi in September 2023 and worked remotely from Georgia. Mr. Hadelman reported to Mr. Greer, and he also resigned from SOCi in April 2024, subsequently joining Yext. I have been informed that Mr. Hadelman told various current SOCi employees that Yext offered him compensation significantly above what is currently the market rate for someone with his level of experience. In the role that Mr. Hadelman occupied prior to his resignation, he had access to many of the same trade secrets and confidential information as Mr. Greer, and this information would be immensely beneficial to any competitor trying to undermine SOCi's competitive advantage in the market.

17. Chris Brownlee was hired by SOCi and began employment on or about September 12, 2022. He reported directly to me, and worked remotely from British Columbia, Canada. During his time at SOCi, Mr. Brownlee held the senior-level position of Senior Director of Product Management and was in charge of SOCi's "Genius Reviews" product. SOCi's Genius Reviews product is its technology that allows SOCi's clients to manage their reputation, including by analyzing and responding to reviews left for their business across all of their networks and locations. Tens of millions of dollars has gone into developing and maintaining SOCi's Genius Reviews product, and there is evidence in the market that this product alone may have an enterprise value of several hundred million dollars. As head of this product, Brownlee had extensive knowledge of SOCi's confidential and trade secret market and product analysis and business plans in this space, including SOCi's approach to how to architect the platform and build workflows specific for the multi-location industry, what issues are typically faced in connecting to networks and how SOCi has overcome those problems.

18. Mr. Brownlee resigned by letter on March 4, and his last day was March 22, 2024. He informed his coworkers he was joining Yext. I have been informed by SOCi employees that Mr. Brownlee was offered a salary significantly above what the market rate is for someone with his experience. Additionally, on or about June 5, 2024, Yext announced in a press release that Mr. Brownlee had been promoted to head of products – this promotion represents a significant elevation in title for Mr. Brownlee, suggesting to me that it was a result of his ability to provide Yext access to SOCi's trade secrets and confidential information concerning the Genius product line rather than his skillset and experience independent of his role with SOCi.

19. As product lead, Brownlee was one of a few people at the company privy to all of SOCi's plans, strategies, and designs for its entire Genius product line, including the underlying

6

technology for the entire Genius product stack – invented by SOCi's CEO Afif Khoury and others, as well as the designs and specifications of up to nine separate Genius products in process. Mr. Brownlee participated in multiple online and in-person meetings where detailed product design and analysis was discussed, and he had extensive access to the relevant documents and code.

20. Thus, Mr. Brownlee had access to confidential and trade secret information about the Genius product line, such as the business plans, the types of products in development, the types of features planned for future releases, release schedules, product features and innovations, what problems the features will address and how, which features they will automate, market and product analysis, SOCi's approach to how to build workflows, and the identity of typical issues faced in connecting to networks and how SOCi has overcome and plans to overcome those problems. All this information has been developed at great effort and expense to SOCi, and the details of the Genius products in development were disclosed to SOCi employees on a need-to-know basis. And, although Genius Review, Genius Social, and Genius Search have all been publicly announced, the details of how they were built, the proprietary processes and algorithms that make them work, SOCi's business plans and market analysis, and other information about them are not publicly known, nor are details about planned future releases and upgrades.

21. Jenette Simisky joined SOCi in November 2022 as a Senior Director of Product Management, and she worked remotely from Massachusetts. Ms. Simisky was in charge of SOCi's "Social" and "Genius Social" products, which allow SOCi's customers to efficiently and effectively manage their social media presence. Both Social and Genius Social are recognized as market leading technology, and SOCi has won numerous awards for its Social product. Though Yext also offers a social media management product, it is generally known to be inferior to SOCi's offerings, and Yext has yet to bring a social media tool that integrates AI to the market, providing

SOCi with a material—and growing—advantage as the use of AI for such products becomes market standard. The Social product generates a significant portion of SOCi's revenue, and it makes up a significant portion of enterprise value. Though the Genius Social product was released only a few months ago, it has performed very well in the market, and is expected to increase SOCi's customer-base and cement SOCi's status as the leading provider of social media management solutions.

22.     Ms. Simisky was an integral part of the creation of Genius Social, and her experience in the development process affords her a deep knowledge of the product, and she retains knowledge and information about the entirety of SOCi's Genius product line, similar to that described for Mr. Brownlee above. In her role at SOCi, Ms. Simisky developed a transferable skillset that would allow her to efficiently guide the creation of a competing product. Her last day at SOCi was May 17, 2024, and Ms. Simisky refused to disclose where she was going to be employed next. I have learned that she later informed individuals at SOCi that she was joining Yext and, much like with Mr. Greer and Mr. Brownlee, Yext offered Ms. Simisky outsized compensation to entice her to violate her continuing obligations to SOCi.

23.     Megan Menesale joined SOCi in June 2021 and worked as a Director of Product Marketing. Though I did not work with her directly, I know that Ms. Menesale's work relating to the development and execution of SOCi's marketing strategies was directly related to SOCi's competition with Yext. Additionally, I am aware that Ms. Menesale was terminated in June 2023, in part due to performance-related issues. I was later informed that after months of struggling to find a job, and after SOCi had granted Ms. Menesale relief from some of the burdens of her non-compete, she accepted employment with Yext in a role substantially similar to the one she held at SOCi. Given my knowledge of her role at SOCi, I believe that Ms. Menesale will inevitably use

to Yext's benefit the confidential information and experience that she gained from her time at SOCi.

## THE FORMER EMPLOYEES' THEFT OF SOCI'S TRADE SECRETS

24. I have learned certain facts that make clear to me that each of the Former Employees, but in particular Mr. Brownlee, Mr. Greer, and Mr. Hadelman, are sharing details of SOCi's trade secrets with Yext.

25. I have learned of multiple instances in which Mr. Greer violated his contractual obligations by disclosing the confidential information and trade secrets he misappropriated from SOCi, after he joined Yext. As described in the Amended Complaint, I have received reports of Mr. Greer leveraging the relationships with SOCi customers and potential customers he created at SOCi to Yext's benefit. Additionally, I have been informed that Mr. Greer has further violated his contractual obligations by recruiting current SOCi employees.

26. On or about April 19, 2024, I received a communication from a senior leader at Yext (the "Yext Insider"), who told me certain upsetting things about what Yext was doing. The Yext Insider reached out to me because the Yext Insider was uneasy about the nefarious disclosure and exchange of SOCi's confidential information. This Yext Insider told me that Yext was specifically targeting SOCi, per a plan implemented by the CEO several months ago, by aggressively recruiting senior SOCi employees to gain knowledge of SOCi's confidential and trade secret information about its customers and its product plans.

27. The Yext Insider also told me about an internal Yext sales meeting that was held both in-person in New York and over Zoom, on or about April 19, 2024. This meeting was attended by Yext's sales leaders, product leaders, and was also attended by both Mr. Greer and Mr. Hadelman. During that meeting Yext displayed on screen, in a presentation deck, extensive information comprised of detailed information about SOCi's customers. During the meeting Mr.

9

Greer and Mr. Hadelman supplemented this written detail with additional commentary and details, spilling confidential details about SOCi's plans for these customers, the terms of their contract with SOCi and contract renewal dates, contract values and terms of service, the products being sold, customer feedback, the problems SOCi's customers face and SOCi's approach to resolving these issues, and other confidential details – all information that would be a road map for a competitor to solicit SOCi's existing customers.

28. Another event made it clear to me that Yext has learned from the Former Employees confidential and trade secret details about SOCi's Genius product line. As a starting point, it is obvious to me that Yext had no comparable AI product line in development. On or about February 29, 2024, Yext held its annual "Yext Summit"—a marketing event that provides insight into the company's offerings and services, promotes new products, and serves as a customer-engagement platform. The event was streamed live to the public and is still available for viewing on the Yext website, and I listened to all parts of the Summit that concerned AI. During that Summit, Yext's speakers opined that AI was not yet ready to lead the way, and instead was only a tool to be used by the human workers creating projects. It was clear from those speakers that Yext had nothing comparable to the Genius product line in development. And if it did, this annual summit, aimed at Yext's customers and potential customers, would have been the place to announce it.

29. Then, on May 13, 2024, shortly before Genius Search was announced, Yext posted a press release to their website for an alleged to-be-completed product called "Listings Recommendations," to apparently compete with (and pre-empt) SOCi's then-secret Genius Search product. The timing of this release, and the fact that the website describes features attempting to mirror what would be offered by Genius Search, shows me that Yext likely learned details of

Genius Search from Brownlee and/or Greer. "Listing Recommendations" supposedly will contain features that superficially appear similar to Genius Search, including using AI and data science to improve local search optimization, monitoring the user's data in the background, integrating market trends into the recommendations and feedback provided with AI, and aiming to help with the management of websites for multi-location businesses. Notably, Yext does not, and cannot, claim the "automation" feature that SOCi developed.

30. The fact that SOCi was developing technologies to provide similar (but more advanced) features, for similar users, was a confidential and trade secret business plan. It is clear to me from the context of Yext's press release that one or more of the Former Employees alerted Yext that SOCi was bringing a new, competitive product to market, in the form of Genius Search, and Yext made the decision to use that information to put out a forward-looking statement about their own product capabilities ahead of SOCi's announcement.

31. That Former Employees are divulging SOCi's confidential information was confirmed on or about June 5, 2024, when I again spoke with the Yext Insider, who told me that Mr. Brownlee was showing other Yext employees detailed documentation about the Genius products, including highly confidential product decks and pitch decks. These types of documents contain highly confidential and sensitive information about Genius, such as tentative release dates, product features, and information related to marketing. I believe Mr. Brownlee will inevitably continue to disclose information he learned about current and future Genius line products to Yext. He is intimately familiar with the product architecture, as well as what issues SOCi faced and how it overcame those problems. As he is now head of product at Yext, his knowledge of SOCi's secret product development will inevitably give Yext an advantage in developing technology to compete with the Genius features.

32. I hereby declare under the penalty of perjury that the foregoing statements made by me are true and correct to the best of my knowledge and belief.

Dated: Mill Valley, California
July 17, 2024

By: *Falk Gottlob*
Falk Gottlob